IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEYSTONE DEDICATED LOGISTICS,    Plaintiff,           vs.  THE FLEXAUST COMPANY, INC., d/b/a  FLEXAUST INDUSTRIAL,    Defendant. | Civil Action No. 09-0569  Magistrate Judge Lisa P. Lenihan  Doc. No. 16 |

## OPINION ON MOTION FOR SUMMARY JUDGMENT

**I. Summation**

The Motion for Summary Judgment filed by Defendant Flexaust Company, Inc. ("Flexaust") will be denied as to Count I, Breach of Contract, but granted as to Counts II and III, Unjust Enrichment and *Quantum Meruit*, as more fully set forth below.

**II. Factual and Procedural History**

Plaintiff ("KDL") alleges that Flexaust breached the parties' Transportation Services Agreement (hereafter the "TSA") and obtained improper benefit from KDL's product transportation-related efforts. The record presently before this Court indicates that:

KDL is a Carnegie, Pennsylvania based transportation "logistics service" provider which analyzes a client's existing product shipping needs, practices and expenses; maintains carrier-industry contacts and negotiates - through a client bid package prepared by KDL - for lower shipping rates with many carriers (utilizing, *e.g.*, volume discounts); provides oversight and weekly billing/payment services regarding the client's product shipments through selected third-party carriers; and makes its profit under contracts entitling it to a percentage of the client's transportation cost savings. Flexaust is a Warsaw, Indiana based manufacturer and supplier of industrial/commercial hoses which ships its products.

On October 2, 2007, the parties entered into a two-page Transportation Services Agreement, governed by Pennsylvania law, the Effective Date of which was left blank. See Complaint Exhibit 1. The TSA provides that KDL would perform services and be compensated as set forth on Schedule A. Id. at ¶ 2. Schedule A, executed concurrently, provides in turn that KDL would analyze one to three months of Flexaust's existing transportation requirements by modes (*i.e.*, less than truckload, truckload, local cartage, expedite, international, and parcel).[1] Thereafter, "KDL [was] authorized to negotiate rates on behalf of Flexaust and *Flexaust agree[d] to utilize those freight companies when said freight companies provide[d] a cost savings over current programs and [met] expected service levels defined by Flexaust*." Schedule A at ¶ 2 (emphasis added). Agreed-upon carriers were referred to as "compliant carriers". Id.

---

[1] Cf. Brief in Support of Response to Defendant's Motion at 2 ("KDL . . . provided Flexaust with a detailed shipping analysis, using approximately 530 past invoices that Flexaust incurred in previous years.").

KDL was to "process Flexaust freight bills weekly"; invoice Flexaust and distribute funds to KDL/compliant carriers; and "track all non-compliance carriers and provide cost of non-compliance usage." Id. at ¶ 3.[2]

In accordance with the TSA, cost savings were determined by reference to the parties' agreed upon "Benchmark Rate Calculations" to be set forth on Schedule B. Although the record contains no schedule B, it contains Appendix B, B-1, B-2 and B-3, which appear to set forth the parties' agreements regarding baseline or "benchmark" prior transportation expenses and anticipated freight savings (the "transportation cost savings"), which were to be divided between the parties.[3] Flexaust was to "compensate KDL by the formula set forth below for all recognized freight savings" and KDL was to "calculate transportation savings defined as 'Benchmark Rate Calculation' less KDL transportation arrangements *or other transportation arrangements* that are less than 'Benchmark Rate Calculations.'" Schedule A at ¶ 4 (emphasis added). But "*IF THERE [WERE} NO SAVINGS THEN THERE [WERE] NO FEES DUE TO KDL*" other than weekly processing fees and expense reimbursements. Id. (emphasis in original).

The TSA further provides for an initial term of 48 months "from the date that the parties agree on carrier pricing", but permits a "one year trial period - early termination" pursuant to which Flexaust could elect to terminate during the 12th to 15th months of the contract. TSA at ¶ 4.

---

[2] See also Memorandum in Support of Summary Judgment at 4.

[3] The only one of these four Appendix pages dated (B-2) is signed December 7, 2007. Two (B-1 and B-2) contain an italicized sentence indicating they were "part of the original contract . . . effective the ___ day of December, 2007" and the last (B-3) contains an italicized sentence indicating it was "part of the original contract . . . effective the ___ day January, 2008". Exhibit 1, Appendix B to B-3.

Early termination required that Flexaust "deliver a written cancellation notice" and provide KDL an "opportunity to meet Flexaust in person." Id.  And cancellation under this provision would take effect ninety (90) days from the date of notice.  Id.  A party might also terminate "for cause", provided that it permitted a thirty (30) day window for remedy of any default.  Id.

Finally, the "Exclusivity" paragraph of the TSA provides that for the term of the TSA and, if early termination were elected, for one year thereafter, Flexaust "agrees not to directly solicit the services of any transportation companies that KDL has introduced to service Flexaust."  Id. at ¶ 5.

KDL obtained pricing models from various carriers, including UPS Freight ("UPS"), and carriers were selected.  Compare Hammel Affidavit at ¶ 13 (attesting that KDL recommended carriers with similar rates to Flexaust, which then selected carriers (other than UPS)) with Memorandum in Support of Motion for Summary Judgment at 6 ("KDL did not accept the bid submitted by UPS Freight . . . .").

The parties began performance under the contract in January, 2008.  See Complaint at ¶ 8 (asserting that KDL "arranged for services at . . . reduced rates to be performed beginning January 1, 2008"); Affidavit of Robert Hammel of KDL ("Hammel Affidavit") at ¶ 9 (same); Memorandum in Support of Motion for Summary Judgment ("Memorandum in Support") at 5 ("Beginning on January 2, 2008, KDL published rates for transportation services for carriers . . . on a website that could be reviewed by Flexaust . . . [and] then arranged for services . . . and Flexaust began using KDL's carriers . . . .").

Flexaust represents that, beginning in May, 2008, it complained to KDL about (1) "increasing costs under the [TSA]" and (2) its discovery that it was "routinely being charged a significantly higher price than" agreed upon by compliant carriers. Hammel Affidavit, Ex. B (Flexaust legal counsel's letter of December 16, 2008) (hereafter the "Termination Letter");[4] see also Memorandum in Support of Summary Judgment at 6.

The parties agree that in Summer 2008, fuel charges increased, as did Flexaust's transportation expenses. In July, the parties met to discuss transportation costs, which KDL maintains were still significantly below the benchmark rates. See Hammel Affidavit at ¶ 21.[5]

That same month, Flexaust discontinued its use of compliant carriers, and began using UPS. The parties dispute whether this change in carriers resulted from Flexaust's direct solicitation of UPS. Compare Complaint at ¶ 12 (asserting that in July, 2008, Flexaust "advised KDL that Flexaust was soliciting bids from other carriers not obtained by KDL") with Memorandum in Support of Motion for Summary Judgment at 3 (asserting entitlement to summary judgment because "nothing in the TSA precludes Flexaust from accepting quotations from . . . carriers not affiliated with KDL"); id. at 6 ("After KDL rejected UPS Freight as one of their [*sic*] carriers for Flexaust, UPS Freight . . . pursued Flexaust's business directly. Thereafter, UPS Freight did agree on pricing with Flexaust and Flexaust began making shipments . . . .").

---

[4] The Termination Letter also indicates that another service complaint was raised in August, 2008, *i.e.*, that compliant carriers were not disputing "all charges associated with the re-weighing of any shipments" in accordance with industry practice, "further justif[ying] Flexaust's use of UPS Freight on its own initiative."

[5] KDL also represents that, at that meeting, it offered Flexaust a greater portion of the transportation savings and Flexaust wished to continue the relationship. See id.

On December 16, 2008, Flexaust, through its legal counsel, advised KDL that it was entitled, under the TSA, "to engage UPS Freight on its own initiative" because KDL-referred carriers "regularly provided no cost savings" and its performance "regularly failed to meet Flexaust's expected service levels." Hammel Affidavit, Ex. B (Letter of December 16, 2008) (hereafter the "Termination Letter").[6] KDL disputes both these assertions. See Hammel Affidavit at ¶ 26. The Termination Letter also indicates that "Flexaust will continue exercising its right to utilize the more favorable pricing structure offered by UPS Freight - a right that is specifically granted by paragraph 2 of Schedule A to the Agreement" and that the letter "further serves as written cancellation notice pursuant to the early termination right granted in Section 4 of the [TSA]." Id.[7]

Plaintiff's Complaint, filed in the Court of Common Pleas of Allegheny County asserts claims for (1) breach of contract, (2) unjust enrichment, and (3) *quantum meruit*.[8] It was

---

[6] A November 6, 2008 correspondence from KDL to Flexaust referenced in the Termination Letter does not appear to have been introduced of record by either party.

[7] The Letter invited KDL to exercise its contractual right to discuss Flexaust's termination decision by contacting Steve Hagan. See id.

[8] KDL raised, in its November, 2008 correspondence, a claim that Flexaust breached the parties' August 2007 Confidentiality Agreement by providing UPS with KDL's pricing structure, to which Flexaust responded that Flexaust had not "provide[d] any element of KDL's pricing structure to UPS" and that UPS reached its pricing agreement by using "information provided by KDL" in connecting with KDL's solicitation of bids. See Termination Letter; Termination Letter Ex. A (December 1, 2008 e-mail to Flexaust from Brent Haupert, UPS Account Manager, indicating that he used the "large packet of information" on Flexaust's shipments, discounts and charges "provided by KDL"). The Complaint's breach of contract claim is premised on Flexaust's purported solicitation of UPS and rejection of qualifying compliant carriers. See Complaint at ¶¶ 12-17; see also id. at ¶¶ 21-22. The Complaint asserts no breach of confidentiality restrictions.

removed to this Court by Defendant in May, 2009. Defendant has filed a Concise Statement of Material Facts, to which Plaintiff responded, and currently pending is Defendant's Motion for Summary Judgment. Defendant asserts that Plaintiff's claims fail for the following reasons:

(1) breach of contract because the "TSA was not exclusive; rather, Flexaust had the right to use or not use transportation services through KDL" and did not "require Flexaust to pay KDL for savings obtained on shipments made through non-KDL provided carriers";[9]

(2) unjust enrichment and *quantum meruit* because, under Pennsylvania law, these doctrine are inapplicable to claims when the relationship between the parties is governed by the terms of a written contract.

### III. Summary Judgment Standard

Summary judgment is to be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

---

The Complaint estimates KDL's lost "commissions" for savings at approximately $240,000. See Complaint at ¶ 18.

[9] Memorandum in Support at 1-2.

All doubts as to the existence of a genuine issue of material fact are resolved against the moving party, and the entire record is examined in the light most favorable to the nonmoving party. Continental Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). However, the nonmoving party may be subject to summary judgment under Rule 56 if, after adequate time for discovery, it "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[10]

## IV. Analysis

### A. Breach of Contract

1. Exclusivity

The TSA expressly *requires* Flexaust to use KDL-referred carriers *when* those carriers offered shipment (a) at a cost savings from the Benchmark Rate and (b) with appropriate service/performance levels. See Schedule A at ¶ 2.[11] KDL asserts that it was continuing to provide such carriers when Flexaust elected to discontinue its use of agreed-upon, or "compliant", carriers and to enter into a direct relationship with UPS transportation services

---

[10] See also Anderson, 477 U.S. at 251-252 (indicating that, distilled to its essence, the summary judgment standard requires the nonmoving party to create a "sufficient disagreement to require submission [of the evidence] to a jury").

[11] See also Memorandum in Support of Motion for Summary Judgment at 8-9 (citing Pennsylvania case law explaining that the Court looks to the written contract itself, and construes the contract in accordance with its plain meaning and unambiguous terms). Compare id. at 9 (asserting that "the terms of the TSA in no way restrict Flexaust from using carriers other than the carriers provided by KDL").

instead. As to service levels, Flexaust attests that its use of compliant carriers was not meeting its criteria. It provides no evidence of its contemporaneous definition of "expected service levels" under the TSA, but does provide some evidence of contemporaneous carrier service complaints.[12] KDL attests that through July, 2008 "there were no service issues, and both KDL and Flexaust profited from their contractual relationship." Hammel Affidavit at ¶ 16. Similarly, Flexaust asserts that "the rates negotiated by KDL actually increased Flexaust's costs of freight as a percentage of its sales by approximately 17%",[13] while KDL asserts that although Flexaust's transportation costs rose in Summer, 2008 as a result of record-level increases in fuel prices,[14] Flexaust's compliance carrier transportation costs were still at a "substantial" savings.[15] The role of fuel pricing in the parties' calculations and agreement is not clarified for this Court by the record.[16] It appears to this Court that, absent a valid termination of the TSA, if Flexaust rejected

---

[12] Although the record contains no documentation of the applicable service criteria, Flexaust could reasonably expect that it would not be overcharged and that its carriers would comply with industry standards. See *supra* at 3 (discussing Termination Letter's assertions regarding Flexaust's complaints in May and June, 2008).

[13] Termination Letter at 1.

[14] See Brief in Support of Response to Defendant's Motion at 9 ("On average, gasoline prices were over $4.00 per gallon and diesel fuel prices were nearly $5.00 per gallon.")

[15] Hammel Affidavit at ¶¶ 19-21. See also Brief in Support of Response at 3 ("At all times after January 1, 2008, Flexaust had shipping rates that were below the benchmark calculation established by the parties in December of 2007."). But see id. at 13 (asserting that Flexaust's contention "that its shipping costs were higher using KDL's services . . . ignores several outside factors over which KDL had no control, such as higher fuel costs, decreased revenues, and lower volume of inventory being shipped").

[16] Appendix B-2, entitled "Logistics Management Fuel Surcharge Benchmark" sets forth columns of prices and percentages based on a "blended current carrier fuel surcharge table". But it provides no further information regarding the use of these figures in the transportation calculations. Cf. Hammel Affidavit at ¶ 17 ("All carriers . . . provide for fuel surcharges based upon increases in gasoline prices."). Neither party has introduced additional evidence of record

*qualifying* carriers, it was in breach of its contract; and as to this matter there are clearly questions of material fact.

    2. <u>Entitlement to Share of Savings Regarding Non-KDL Carrier</u>

Although the TSA clearly states the conditions requiring Flexaust's use of compliant carriers, KDL makes (as Defendant observes) conflicting statements regarding Flexaust's obligations.[17] And KDL asserts that even if Flexaus was free, in its circumstances, to utilize other carriers, KDL was still entitled to its share of any cost savings, in accordance with the "KDL Fees" provision of Schedule A.

The contract documentation does not expressly *illustrate* what non-KDL transportation arrangements the client might be utilizing. Under the plain language of the TSA, however, if KDL failed to identify, or timely identify, a carrier meeting the cost and service criteria for particular shipment/transportation projects or more generally, the client could arrange shipment through a non-KDL carrier. And Schedule A further reflects the parties' anticipation of non-compliance carriers/usage and "other transportation arrangements." Schedule A at ¶¶ 3-4. The fee provisions, as set forth *supra*, indicate that a percentage of any "other transportation

---

regarding Flexaust's transportation costs prior to, during, or subsequent to the KDL service period. <u>Cf. id.</u> at ¶ 21 (attesting that parties met in July, 2008, and KDL reviewed documentation with Flexaust to explain/demonstrate continued savings).

    [17] <u>See, *e.g.*</u>, Defendant's Reply to Plaintiff's Brief in Support of Response at 1, & n. 1 (comparing excerpts from Plaintiff Brief in Support that "Flexaust was free to switch carriers" and that the TSA contemplated that Flexaust might "choose to use a different set of shipping arrangements" with statement in Brief that "obligat[ing] Flexaust to exclusively use KDL's shipping carriers" was "exactly the purpose of the Agreement"). <u>But see</u> Response to Defendant's Statement of Undisputed Material Facts (more clearly attesting that: "Flexaust was not obligated to refrain from using other carriers. Flexaust was, however, obligated 'to utilize those freight companies when said freight companies provided a cost savings over current programs and meet expected service levels defined by Flexaust.'").

arrangements" cost savings from the Benchmark Rate would still be passed on to KDL under the parties' agreement.  Id. at ¶ 4.[18]

KDL attests that bills which it received from UPS for services provided to Flexaust indicated that UPS was using the KDL recommended rate structure, *i.e.*, rates "substantially below the established benchmark."  Hammel Affidavit at ¶ 24.[19]  Here too, then, questions of material fact preclude summary judgment.

3.  Termination

Although the TSA has an initial term of 48 months, it was terminable during the early opt-out window or for cause, subject to further contractual conditions.  As discussed, *supra*, no effective date was set forth by the parties, most of the Schedules/Appendices are undated, and the

---

[18] Cf. Hammel Affidavit at ¶ 13 ("KDL includes this provision in its contracts because customers benefit from KDL's efforts in making transportation arrangements even if the customer decides to use carriers not obtained by KDL because the customer would still be able to use the rate obtained by KDL with 'other' carriers.").

Compare Memorandum in Support of Motion for Summary Judgment at 9 (asserting that "the TSA in no way requires Flexaust to pay KDL for cost savings it achieved, through its own devices, by contracting separately with other carriers not affiliated with KDL") with Response to Motion at ¶ 4 ("Flexaust, while still under contract with KDL, began using suppliers originally provided by KDL and no longer paid KDL for the savings obtained."); Cf. Response to Motion at ¶ 5 ("KDL, using its contacts in the shipping industry, supplied several favorable price quotes for shipping to Flexaust.  In July of 2008, Flexaust switched carriers to UPS Freight, and UPS gave Flexaust favorable rates, based on the quotes solicited by KDL.  Without the previous work that KDL performed, Flexaust would never have received [those] rates."); Brief in Support of Response at 10 (asserting that the UPS rates were obtained by "KDL's expertise, analysis, consulting, and shipping logistics information").

[19] See also Termination Letter, Ex. A (December 1, 2008 email from UPS indicating that the transportation agreement it made directly with Flexaust was based on the "large packet of information" regarding, *e.g.*, Flexaust's volume/weight/product of shipments and minimum competitive bid levels, put together by KDL).

record does not establish when the parties agreed on carrier pricing (by which the TSA, at ¶ 4, references the effective date). The record does suggest that the last of Appendices B was executed in January 2008. As also discussed *supra*, the Termination Letter indicates that it served

"as written cancellation notice pursuant to the early termination right granted in Section 4 of the [TSA]."

Accordingly, the facts of record, as summarized *supra*, leave open questions of material fact as to, *e.g.*, whether Flexaust communicated a valid termination notice within the 12 to 15 month early termination window and provided the contractually required opportunity to meet,[20] in which case termination would be effective 90 days from the valid notice. Similarly, there may remain questions as to whether the Termination Letter could, given the three (3) service-related complaints outlined therein, constitute factually-supported termination for cause, and, if so, whether the contractual requirement of a 30-day period to cure any default was provided.[21] An effective termination of the TSA would, of course, affect the period during which Plaintiff might be entitled to recovery for Defendant's breach, while an ineffective termination would not.

    4. Direct Solicitation

Paragraph 5 of the TSA, drafted by KDL, limits itself to an agreement by Flexaust that it will not "directly solicit the services of any transportation companies that KDL has introduced to service Flexaust" during the contract term or, in the event of early termination, for one year

---

[20] See *supra* at 5-6 & n. 7.

[21] The Court notes that the record suggests that the Letter did not intend a termination for cause and that the requisite opportunity to cure was not provided. It need not further address these matters at this time.

therafter.  Thus liability for breach of this provision turns on the factual question of the relationship/contact history between Flexaust and UPS, a matter of disagreement between the parties.  More specifically, KDL attests that Flexaust solicited transportation services from UPS.  See Hammel Affidavit at ¶ 23 (stating that when Flexaust stopped using KDL's carriers, "Steve Harvey of Flexaust stated [in a conference call] that 'we weren't saving money, so we went out and got better rates.'").  Flexaust contests that "UPS approached Flexaust".  Defendant's Reply to Plaintiff's Brief in Support of Response at 2.[22]  Due to these factual disputes summary judgment on this breach of contract question must be denied.

**B.  Unjust Enrichment;** *Quantum Meruit*

As explained in Flexaust's Memorandum in Support of Motion for Summary Judgment, the doctrines of unjust enrichment and *quantum meruit* are, under Pennsylvania law, inapplicable with regard to matters governed by enforceable contract provisions.  See Memorandum in Support at 14-16; see, *e.g.*, Schott v. Westinghouse Elec. Corp., 259 A.2d 443, 448 (Pa. 1969) ("[W]e note that this Court has found the quasi-contractual doctrine of unjust enrichment inapplicable when the relationship between parties is founded on a written agreement or express contract. Third National Bank & Trust Co. of Scranton v. Lehigh Valley Coal Company, 353 Pa.

---

[22] Cf. Flexaust's Termination Letter (repeatedly referring to its justified "use" or "engagement" of UPS Freight "on [Flexaust's] own initiative"); Memorandum in Support of Summary Judgment at 5 (explaining that when Flexaust's transportation costs "were higher using KDL's services compared with its [prior] transportation costs", *"[c]onsequently,* at that point in time, Flexaust received bids and obtained shipping services from [other] carriers." (emphasis added).

185, 193, 44 A.2d 571 (1945). See also Horsham Township v. Weiner, 435 Pa. 35, 255 A.2d 126 (1969) and Wingert v. T. W. Phillips Gas & Oil Co., 398 Pa. 100, 105, 157 A.2d 92 (1959)).[23]

As Flexaust also correctly observes, unjust enrichment is an equitable doctrine which implies a contract requiring a defendant to pay the value of benefits conferred, and *quantum meruit* is a form of restitution applicable in such cases. See id. at 14-15 (citing cases, including Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. 1999); Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 998 (3d Cir. 1987) (explaining that "where an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided in the express contract")).

Although KDL was entitled, under Pa. R. C. P. 1020, to plead a claim for unjust enrichment/*quantum meruit* in the alternative,[24] because this Court concludes that the matters in dispute[25] are governed by the terms of the parties enforceable written agreement, KDL's claim is one for breach of contract.[26]

---

[23] Cf. Complaint at ¶¶ 25-29 (asserting claims for unjust enrichment and *quantum meruit* based on "agreed upon fees" and compensation as "set forth in the TSA").

[24] See, *e.g.* Babiarz v. Bell Atlantic-Pennsylvania, Inc., 2001 WL 1808554, *16 (Pa.Com.Pl. July 10, 2001) ("It is true that a plaintiff may plead alternative causes of action for breach of contract and unjust enrichment in the same complaint.").

[25] Those matters are Flexaust's liablity for (a) improperly rejecting qualified carriers under the TSA, (b) transportation savings obtained in its dealings with UPS while the TSA was in force, and/or (c) its direct solicitation of UPS).

[26] Flexaust properly distinguishes the cases cited in KDL's Brief in Support of Response. See Defendant's Reply to Plaintiff's Brief in Support at 5 & n. 6. See also J.A. & W.A. Hess, Inc. v. Hazle Township, 350 A.2d 858 (Pa. 1976) (recognizing alternative action for unjust enrichment where it was unclear if contract existed or was enforceable); Lampl v. Latkanich, 231 A.2d 890 (Pa. Super. 1967) (recognizing alternative action for *quantum meruit* where matters in dispute, *e.g.*, fees to which plaintiff was entitled, were not governed by contract).

## V. Conclusion

An Order consistent with the Memorandum Opinion will be entered.

							_____
							LISA PUPO LENIHAN
							United States Magistrate Judge

Dated: April 16, 2010